UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
    v.                              )   Criminal No. 09-0026 (PLF)
                                    )
RICO RODRIGUS WILLIAMS,             )
                                    )
    Defendant.                      )
_____ )

OPINION

Defendant Rico Rodrigus Williams, a former member of the United States Air Force, killed Army Sergeant Juwan Johnson during a Gangster Disciples gang initiation that took place on July 3, 2005, near the Ramstein Air Force Base in Germany. In Count One of the Indictment in this case, the government charged Mr. Williams with second degree murder in connection with Sergeant Johnson's death, asserting jurisdiction under the Military Extraterritorial Jurisdiction Act ("MEJA"). 18 U.S.C. § 3261 et seq.

As the Court instructed the jury, in order for Mr. Williams to be found guilty of second degree murder under MEJA, the government was required to prove at trial five elements beyond a reasonable doubt:

> First, that the defendant unlawfully killed Juwan Johnson; second, that the defendant killed Juwan Johnson with malice aforethought . . . ; third, at the time he killed Juwan Johnson, the defendant was the dependent of a member of the United States Armed Forces outside the United States, in the Federal Republic of Germany; fourth, at the time he killed Juwan Johnson, the defendant was residing with such member of the United States Armed Forces outside the United States, in the Federal Republic of Germany; [and] fifth, that the defendant is not a national of or ordinarily a resident in the Federal Republic of Germany.

Nov. 9, 2010 Trial Tr. at 38. On November 15, 2010, the jury concluded that the government satisfied its burden on Count One, finding Mr. Williams guilty of second degree murder.[1]

This matter is before the Court on Mr. Williams' motion for judgment of acquittal on Count One. The motion raises two grounds for acquittal: as Mr. Williams describes it, the government failed to prove at trial (1) that Mr. Williams killed Sergeant Johnson with malice aforethought; and (2) that Mr. Williams "resided with a member of the Armed Forces outside the United States on the date of [Sergeant] Johnson's death[.]" Mot. at 2.

The Court heard oral argument on Mr. Williams' motion on June 1, 2011. The Court then resolved the first part of the motion by oral opinion on June 3, 2011, concluding that "with respect to the mens rea element, the motion . . . should be denied." June 3, 2011 Tr. at 47; see id. at 28-46. In that oral opinion, however, the Court stated that it was not ruling on Mr. Williams' motion regarding the "residing with" element under MEJA, 18 U.S.C. § 3267(2)(B), because the Court would be directing the parties to file supplemental briefing. See June 3, 2011 Tr. at 55-56. That briefing since has been completed, and this matter now is ripe for decision. Upon consideration of the parties' papers, the oral argument presented by counsel, the relevant legal authorities, and the entire record in this case, the Court will deny the remaining part of Mr. Williams' motion.[2]

---

[1] The jury also found Mr. Williams guilty of one count of witness tampering.

[2] The papers reviewed in connection with the pending motion include: the re-typed indictment ("Indictment") [Dkt. No. 128]; the jury verdict form ("Verdict Form") [Dkt. No. 137]; the defendant's motion for judgment of acquittal on Count One ("Mot.") [Dkt. No. 141]; the government's omnibus opposition to the defendant's post-trial motions ("Opp.") [Dkt. No. 144]; the defendant's reply to the government's opposition to his motion for judgment of acquittal on Count One ("Reply") [Dkt. No. 146]; the defendant's response to the Court's Order of June 6, 2011 ("Supp. Resp.") [Dkt. No. 151]; the government's opposition to the defendant's response to the Court's Order of June 6, 2011 ("Opp. to Supp. Resp.") [Dkt. No. 154]; and the defendant's reply to the government's opposition to the defendant's response to the Court's Order of June 6, 2011 ("Reply to Opp. to Supp. Resp.") [Dkt. No. 158].

I. BACKGROUND

On February 3, 2009, a grand jury returned an Indictment charging defendant Rico Rodrigus Williams with one count of second degree murder and three counts of witness tampering. Before trial, the government dismissed one of the witness tampering counts.

As charged in Count One of the Indictment, on or about July 3, 2005, Mr. Williams unlawfully killed Sergeant Juwan Johnson during a Gangster Disciples gang initiation in Germany by striking Sergeant Johnson with his fists and kicking him with his feet. See Indictment ¶ 5. As charged in Counts Two and Three, Mr. Williams then intimidated and threatened, or attempted to intimidate and threaten, other members of his gang with the intent to prevent them from communicating information about the events surrounding Sergeant Johnson's death to United States law enforcement authorities. See id. ¶¶ 7, 9.

As for Count One, the Indictment specifically charged the following:

3. On or about July 3, 2005, the defendant, **RICO RODRIGUS WILLIAMS**, a citizen of the United States, was accompanying the Armed Forces outside the United States, as defined in 18 U.S.C. § 3267(2), that is:

   a. The defendant was the dependent of a member of the United States Armed Forces;

   b. The defendant was residing with such member of the United States Armed Forces outside the United States in the Federal Republic of Germany;

   c. The defendant is not a national of or ordinarily a resident in the Federal Republic of Germany; and

   d. The conduct described in Count One of this Indictment occurred at or near Hohenecken, in the Federal Republic of Germany.

3

> 4. The conduct described herein constitutes an offense which would be punishable by imprisonment for more than one year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States.
>
> 5. On or about July 3, 2005, in the Federal Republic of Germany, the defendant, **RICO RODRIGUS WILLIAMS**, and others known and unknown to the grand jury, with malice aforethought, did unlawfully kill Juwan Johnson by striking him with their fists and kicking him with their feet.

Indictment ¶¶ 3-5 (emphasis in original).

Trial in this case began on October 25, 2010. After the government completed its case-in-chief, Mr. Williams orally moved for judgment of acquittal on all three counts in the Indictment. See Nov. 2, 2010 Trial Tr. at 5-11, 23, 25-29.[3] The Court denied Mr. Williams' motion on Count Two, see id. at 43, but reserved its decision on Counts One and Three. See id. at 52. Mr. Williams then renewed his oral motion after he rested, and the Court again reserved its decision. See Nov. 4, 2010 Trial Tr. at 39.

On November 15, 2010, Mr. Williams was found guilty on Count One, second degree murder; and Count Two, witness tampering. See Verdict Form at 1-2. Mr. Williams was acquitted on Count Three, the other witness tampering count. See id. at 2. After the jury rendered its verdict, Mr. Williams requested the opportunity for post-trial briefing, see Minute Entry, Nov. 15, 2010, and he then filed three post-trial motions, see Dkt. Nos. 139, 140, 141, including his pending motion for judgment of acquittal on Count One.

---

[3] The government did not formally rest until November 3, 2010. See Nov. 3, 2010 a.m. Trial Tr. at 10. With the parties' agreement, however, the Court heard Mr. Williams' oral motion for judgment of acquittal on November 2, 2010, pursuant to the express understanding that the government would not introduce any additional evidence after such argument except for three stipulations that the parties agreed to. See Nov. 2, 2010 Trial Tr. at 4. Therefore, as the Court observed and as the parties agreed, at the time Mr. Williams orally moved for judgment of acquittal, he knew "what the entire government case [was]." Id. at 5.

4

The Court heard argument on those motions on June 1, 2011 and issued an oral opinion on June 3, 2011. See generally June 3, 2011 Tr. That oral opinion resolved all of the issues presented in Mr. Williams' three post-trial motions, see generally id., except one: Mr. Williams' claim that "the government failed to offer sufficient evidence that [he] resided with a member of the Armed Forces outside the United States on the date of [Sergeant] Johnson's death[.]" Mot. at 2; see also June 3, 2011 Tr. at 55-56.[4]

The Court ordered supplemental briefing on the "residing with" element. As the Court explained:

> Mr. Williams was convicted of second degree murder pursuant to the Military Extraterritorial Jurisdiction Act[.] Under MEJA, the government was required to prove beyond a reasonable doubt that Mr. Williams was "residing with" a member of the United States Armed Forces outside of the United States at the time of the events in question. 18 U.S.C. § 3267(2)(B); see also Nov. 9, 2010 Tr. at 38-39. Despite extensive briefing and oral argument with respect to the evidence in the record that relates to the "residing with" prong of MEJA, the Court finds that there has been little discussion of the applicable law.

Memorandum Opinion and Order at 1, June 6, 2011 [Dkt. No. 149]. The Court therefore directed the parties to file supplemental briefs discussing any authority that may assist the Court in its consideration of the meaning of the term "residing with" under MEJA. Id. at 2.

---

[4] Mr. Williams subsequently filed one additional motion regarding the instructions given to the jury on Count Two, in view of the Supreme Court's recent decision in Fowler v. United States, 131 S. Ct. 2045 (2011). See Dkt. No. 152. The Court has denied that motion by an Opinion and Order also issued today.

## II. LEGAL STANDARD

Under Rule 29 of the Federal Rules of Criminal Procedure, the Court must enter a judgment of acquittal on any offense charged for which the evidence is insufficient to sustain a conviction. United States v. Safavian, 644 F. Supp. 2d 1, 7-8 (D.D.C. 2009). In ruling on a motion for judgment of acquittal, the Court must "'consider[] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt.'" United States v. Kayode, 254 F.3d 204, 212 (D.C. Cir. 2001) (quoting United States v. Harrington, 108 F.3d 1460, 1464 (D.C. Cir. 1997)). The Court must "accord[] the government the benefit of all legitimate inferences," United States v. Weisz, 718 F.2d 413, 437 (D.C. Cir. 1983), and accept the jury's verdict of guilt if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Arrington, 309 F.3d 40, 48 (D.C. Cir. 2002) (emphasis in original) (quotations omitted). Put another way, the Court may grant a motion for judgment of acquittal only where "a reasonable juror *must necessarily* have had a reasonable doubt as to the defendant['s] guilt." United States v. Weisz, 718 F.2d at 437 (emphasis in original).

## III. DISCUSSION

Mr. Williams was convicted of second degree murder, 18 U.S.C. § 1111(a), under MEJA. 18 U.S.C. § 3261 et seq. See Indictment ¶¶ 2-5; Verdict Form at 1-2. "Congress enacted MEJA in response to a jurisdictional gap created by host nations' reluctance to prosecute crimes against Americans committed by civilians accompanying the Armed Forces outside the

United States." United States v. Arnt, 474 F.3d 1159, 1161 (9th Cir. 2007). "To close this gap, MEJA creates federal jurisdiction over those who commit felonies while 'accompanying the Armed Forces outside the United States.'" Id. (quoting 18 U.S.C. § 3261(a)(1)). Under MEJA,

> [a] person is "accompanying the Armed Forces outside the United States," if [that person] satisfies three requirements: [he or] she must be "(A) [a] dependent of . . . a member of the Armed Forces; (B) residing with such member . . . outside the United States; and (C) not a national of or ordinarily resident in the host nation."
> 18 U.S.C. § 3267(2).

United States v. Arnt, 474 F.3d at 1161.

In Count One, Mr. Williams was charged with second degree murder in the killing of Sergeant Johnson — the underlying felony offense — committed while he was accompanying a member of the United States Armed Forces in Germany. Because the government asserted jurisdiction under MEJA, the government was required to prove beyond a reasonable doubt both the standard elements of second degree murder, 18 U.S.C. § 1111(a), and MEJA's jurisdictional elements. 18 U.S.C. § 3267(2). Thus, among other things, the government was required to prove beyond a reasonable doubt that Mr. Williams was "residing with" a member of the United States Armed Forces outside of the United States at the time he killed Sergeant Johnson, 18 U.S.C. § 3267(2)(B); and that Mr. Williams was "not a national of or ordinarily resident in the host nation," id. § 3267(2)(C), that is, Germany. See Nov. 9, 2010 Trial Tr. at 38-39.

In his oral motion on November 2, 2010, Mr. Williams argued that he was entitled to judgment of acquittal because, as he saw it, the government did not meet its burden of proof on MEJA's "residing with" element and its nationality element. See Nov. 2, 2010 Trial Tr. at 6-10. In his post-trial briefing, however, Mr. Williams appears to have abandoned his

7

argument on the nationality element; he does not address it at all in his papers, and neither does the government. Instead, Mr. Williams argues only that "the government failed to prove beyond a reasonable doubt that Mr. Williams resided with a member of the United States Armed Forces at the time of the events in question[.]" Mot. at 1; see id. at 2, 13-18.

The government disagrees, arguing that it presented more than sufficient evidence at trial to meet its burden on the "residing with" element. According to the government, the evidence at trial proved that, at the time of Sergeant Johnson's death, Mr. Williams resided in Germany with his wife, Octavia Williams, who was a member of the United States Armed Forces. See Opp. at 2, 5-6.

In what follows, the Court first addresses Mr. Williams' oral argument on the nationality element. The Court will resolve that argument on its merits, because the Court reserved its decision on Mr. Williams' oral motion and because his papers suggest that the nationality element may still be an issue in dispute. See Mot. at 1 n.1. The Court then addresses Mr. Williams' argument on the "residing with" element.

*A. Nationality Element*

The government was required to prove beyond a reasonable doubt that Mr. Williams "is not a national of or ordinarily a resident in the Federal Republic of Germany." Nov. 9, 2010 Trial Tr. at 38. In his oral motion for judgment of acquittal, Mr. Williams argued that the government did not do so: as Mr. Williams' counsel stated, "I don't recall any testimony, frankly, about [that element]. I think [the government] put in [Mr. Williams'] security clearance that says he's a U.S. citizen, but that doesn't say that he's not a national of Germany." Nov. 2,

8

2010 Trial Tr. at 6; see also id. at 10. To the extent that this element is still in dispute, the Court has considered Mr. Williams' argument on its merits and will reject it.

At trial, the government introduced Government Exhibit 120. See Nov. 3, 2010 a.m. Trial Tr. at 8-9. As the government and Mr. Williams stipulated, that exhibit consists of two pages of a questionnaire for United States national security positions, referred to as a Standard Form 86, "completed by the defendant and . . . maintained in his United States Air Force personnel file." Id. at 9; see also Gov't Ex. 120a at 1. In that questionnaire, dated October 4, 1996, Mr. Williams states that he was born in Hattiesburg, Mississippi, and that he is a United States citizen or national by birth. Gov't Ex. 120 at 1. Furthermore, that questionnaire specifically directed Mr. Williams to indicate whether he was at the time or previously had been a dual citizen. It stated: "If you are (*or were*) a dual citizen of the United States and another country, provide the name of that country[.]" Id. (emphasis in original). Mr. Williams responded: "NA," id., presumably meaning not applicable. In view of this evidence, which was stipulated to at trial and, according the government the benefit of all legitimate inferences, the Court concludes that a reasonable juror could have found beyond a reasonable doubt that Mr. Williams "is not a national of or ordinarily a resident in the Federal Republic of Germany." Nov. 9, 2010 Trial Tr. at 38.

### B. "Residing With" Element

The government also was required to prove beyond a reasonable doubt that, "at the time [Mr. Williams] killed Juwan Johnson, the defendant was the dependent of a member of the United States Armed Forces outside the United States, in the Federal Republic of Germany,"

and that "at the time he killed Juwan Johnson, the defendant was residing with such member of the United States Armed Forces outside the United States, in the Federal Republic of Germany[.]" Nov. 9, 2010 Trial Tr. at 38; see also 18 U.S.C. § 3267(2)(A)-(B). As Mr. Williams' counsel acknowledged at oral argument on June 1, 2011, Mr. Williams does not dispute that, at the time of Sergeant Johnson's death on July 3, 2005, Mr. Williams was a dependent of his wife, Octavia Williams, who was a member of the United States Armed Forces. Mr. Williams' motion for judgment of acquittal focuses instead on the "residing with" element: he asserts that there is no evidence in the record that he was "residing with" his wife on July 3, 2005, and that the record in fact shows to the contrary. Therefore, Mr. Williams contends that the government failed to satisfy it burden regarding that element of second degree murder under MEJA.

The relevant evidence in the record on the "residing with" element comes from the testimony of three of the government's witnesses, all of whom were members of the Gangster Disciples in Germany: (1) Nicholas Sims; (2) Florentino Charris; and (3) Themitrios Saroglou. See Mot. at 3-4; Opp. at 4-6. Mr. Williams acknowledges that there is testimony in the record to the effect that he did in fact live with his wife while he was in Germany. See Mot. at 3. The problem for the government, as Mr. Williams sees it, is that none of the government's witnesses provided any time frame for *when* Mr. Williams lived with his wife. See id. at 3-4. That alone, according to Mr. Williams, is a sufficient basis upon which to grant his motion for judgment of acquittal. But going further, Mr. Williams asserts that there is evidence in the record indicating that, around June 2005, Mr. Williams and his wife were having marital problems, see Oct. 25, 2010 p.m. Trial Tr. at 78, and that he was "moving around staying with people" and "was all over

10

the place" during that time. Oct. 26, 2010 p.m. Trial Tr. at 29; see Mot. at 3. Thus, to the extent that the evidence in the record permits any inference regarding the "residing with" element, Mr. Williams argues that the only appropriate inference in this case is that he was *not* living with his wife on July 3, 2005.

The government conceded at oral argument on June 1, 2011 that it did not ask any of its witnesses whether Mr. Williams in fact resided with his wife on July 3, 2005. And the government implicitly acknowledges that there was no direct evidence introduced at trial on this issue. See Opp. at 5. According to the government, however,

> [g]iven that the testimony [at trial] unequivocally provides that Octavia Williams was the only person with whom the defendant "resided" or with whom he lived during the year 2005 . . . , the jury could clearly have reached the inference that the defendant was residing there with his wife on July 3, 2005, at the time he killed Sergeant Juwan Johnson.

Id.

Although the parties disagree on what inferences, if any, can be drawn from the evidence introduced at trial, the parties appear to agree on how to define the term "residing with." MEJA itself does not further define it. See Supp. Response at 3-5; Opp. to Supp. Response at 2. MEJA's legislative history emphasizes what is plain from the Act's enacted text: in order to assert jurisdiction under MEJA, "[i]n all cases . . . the dependent *must* reside with the military member[.]" H.R. REP. 106-778(I), 2000 WL 1008725, at *10 (2000) (emphasis added). But the legislative history does not provide any further guidance on what it actually means to "reside with" a military member. Nor do the regulations promulgated for the purpose of "[i]mplement[ing] policies and procedures, and assign[ing] responsibilities under [MEJA],"

11

32 C.F.R. § 153.1(a), define the term "residing with" or "residence." See Supp. Response at 4. Consequently, the government recommends — and Mr. Williams does not disagree — that the Court should apply the "'commonly accepted meaning'" of the term "'resid[ing]'" in consideration of Mr. Williams' motion. Opp. to Supp. Response at 2 (quoting United States v. Namey, 364 F.3d 843, 845 (6th Cir. 2004)) (alteration in original).

As the Sixth Circuit has recognized, "[t]he term 'reside' has a commonly accepted meaning." United States v. Namey, 364 F.3d at 845.

> Dictionaries define "reside" as "[t]o live in a place for a permanent or extended time," WEBSTER'S II NEW COLLEGE DICTIONARY 943 (2001), or to "[l]ive, dwell . . . to have a settled abode for a time. . . ." BLACK'S LAW DICTIONARY (5th ed. 1979). An ordinary person would understand that a person resides where the person regularly lives or has a home as opposed to where the person might visit or vacation.

United States v. Namey, 364 F.3d at 845 (alterations in original); see United States v. Spencer, 640 F.3d 513, 523 (2d Cir. 2011) ("[R]esidence requires an established abode, . . . permanent for a time, and such interpretation does not impact [people] who reside [somewhere] on a short and transient basis.") (quotations omitted) (alterations in original); United States v. Novak, 607 F.3d 968, 974 (4th Cir. 2010) ("[W]e conclude that the district court did not err when it defined 'resided' as 'the act or fact of living in a given place permanently or for an extended period of time[.]'").

Although a person's residence requires some degree of permanence, it is to be distinguished from a person's domicile, which requires more and a certain intent. See, e.g., United States v. Venturella, 391 F.3d 120, 125 (2d Cir. 2004); Kanter v. Warner-Lambert Co., 265 F.3d 853, 857 (9th Cir. 2001). As defined at common law,

> [d]omiciliaries are those who have a fixed, permanent and
> principal home and to which, whenever absent, they always intend
> to return. At the opposite end of the scale are transients, those
> persons who are just passing through a locality. In between these
> notions of permanence and transience are residents. Residency
> means an established abode, for personal or business reasons,
> permanent for a time. A residence is so determined from the
> physical fact of that person's living in a particular place. One may
> have more than one residence in different parts of this country or
> the world, but a person may have only one domicile. A person
> may be a resident of one locality, but be domiciled in another.

United States v. Venturella, 391 F.3d at 125. Thus, residence is "[t]he act or fact of living in a given place for some time, while domicile is a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere." Id. (quotations omitted) (alteration in original); see also Kanter v. Warner-Lambert Co., 265 F.3d at 857 ("Residence is physical, whereas domicile is generally a compound of physical presence plus an intention to make a certain definite place one's permanent abode[.]") (quotations omitted). "'An individual consequently may have several residences, but only one domicile.'" United States v. Namey, 364 F.3d at 845 (quoting Eastman v. University of Michigan, 30 F.3d 670, 673 (6th Cir. 1994)).

Therefore, in view of the case law discussed above, the question presented by Mr. Williams' motion is whether any reasonable juror could have found that Mr. Williams resided with his wife — that is, was living with his wife for some time — on July 3, 2005. See United States v. Venturella, 391 F.3d at 125; United States v. Namey, 364 F.3d at 845.

The Court begins its examination of the record with a discussion of what the government did not do at trial. The government failed to ask any of its witnesses where Mr. Williams was living on July 3, 2005 — "the simple question that would [have] avoid[ed] the

13

need for judicial consideration of what should be a non-problem" in this case. United States v. Hall, 613 F.3d 249, 253 (D.C. Cir. 2010) (quotations omitted). Nor did the government introduce the type of evidence that has been considered indicia of residency; for example, evidence on where Mr. Williams received mail, or where Mr. Williams stored his belongings. See, e.g., United States v. Maduno, 40 F.3d 1212, 1215 (11th Cir. 1994) ("Additional evidence indicated that the husband, although he slept elsewhere, still used the marital home to receive his personal mail, to store his clothes and books, and to serve as the address on the voter's registration card."). Instead, the government relies on the testimony of Nicholas Sims, Florentino Charris, and Themitrios Saroglou, and concludes that their combined testimony "unequivocally provides that Octavia Williams was the only person with whom the defendant 'resided' or with whom he lived during the year 2005[.]" Opp. at 5. The government then contends that a reasonable juror could infer from such testimony that Mr. Williams was residing with his wife on July 3, 2005. Id. at 5-6.

The Court therefore reviews below the relevant testimony from those three witnesses:

*1. Nicholas Sims*. Mr. Sims testified that Mr. Williams was the "[g]overnor" or "head" of their "set" of the Gangster Disciples gang in Germany, Oct. 25, 2010 a.m. Trial Tr. at 81-82, and Mr. Sims identified himself as Mr. Williams' "right-hand man." Id. at 81; see also Oct. 25, 2010 p.m. Trial Tr. at 3-4. Without any specific time reference, Mr. Sims stated that the Gangster Disciples would have meetings "[a]t least twice a month[.]" Oct. 25, 2010 p.m. Trial Tr. at 3. According to Mr. Sims, gang members were required to attend those meetings, the "majority" of which were held at Mr. Williams' home. Id. at 4. Mr. Sims then identified

14

Government Exhibit 47 as a picture of Mr. Williams' home in Germany, id. at 4-5, and Mr. Sims stated that he went to Mr. Williams' home "on a regular basis." Id. at 4.

Mr. Sims then was asked about Mr. Williams' marital status, and Mr. Sims testified as follows:

> Q. Now, do you know whether or not around 2004, 2005 was the defendant married?
> A. Yes.
> Q. To whom?
> A. Octavia.
> Q. Did Octavia live at that house [identified as Government Exhibit 47] with him?
> A. Yes, ma'am. . . .
> Q. [L]et's go to July 4th, July 3rd and July 4th of 2005, was the defendant in the military at that time?
> A. No ma'am. . . .
> Q. Was his wife in the military?
> A. Yes, ma'am.
> Q. And what branch of the service was she in?
> A. Air Force.

Oct. 25, 2010 p.m. Trial Tr. at 5-6.

On cross-examination, Mr. Sims was asked whether Mr. Williams, as of June 2005, was "having problems with his wife . . . . [m]arital problems?" Oct. 25, 2010 p.m. Trial Tr. at 78. Mr. Sims responded: "Yes." Id. And in later testimony, Mr. Sims provided further description of Mr. Williams' marital problems and living situation:

> Q. [Y]ou knew Mr. Williams' wife, Octavia, correct?
> A. Yes.
> Q. And you knew that they were having marital problems?
> A. You could see it.
> Q. And as a matter of fact, was he moving around and staying with people, other people? . . . .
> Q. Was he moving around staying with people?
> A. Yes, sir.
> Q. Other people in the group . . . do you know who he was

15

>     staying with? Let me put it that way.
> A. He was all over the place.

Oct. 26, 2010 p.m. Trial Tr. at 29.

Finally, Mr. Sims testified that, on July 4, 2005, after learning of Sergeant Johnson's death, Mr. Williams and certain members of the Gangster Disciples, including Mr. Sims, Latisha Ellis, Rodney Howell, and Terrence Norman, had a meeting at a cookout. Oct. 25, 2010 p.m. Trial Tr. at 36. At that meeting, Mr. Williams told Mr. Sims that he "may have to leave" Germany. Id. at 38. And as established later by stipulation, Mr. Williams in fact left Germany for the United States on July 6, 2005:

> [A]ccording to records made and maintained by the United States Customs and Border Patrol, on July 6, 2005, the defendant, Rico Rodrigus Williams, flew from Frankfurt, Germany to New York on Delta Air Lines Flight 107. The defendant used his United States passport to enter the United States. The defendant entered the United States at 2:44 p.m. on July 6, 2005.

Gov't Ex. 102a; see also Nov. 3, 2010 a.m. Trial Tr. at 9. Mr. Williams never returned to Germany. See Nov. 4, 2010 Trial Tr. at 28-32; see also Oct. 25, 2010 a.m. Trial Tr. at 57.

*2. Florentino Charris*. Mr. Charris testified that he was deployed to Iraq on January 8, 2004, and that he was in Iraq for "15 months." Oct. 26, 2010 p.m. Trial Tr. at 51. Mr. Charris was deployed back to Germany in "[a]bout March of 2005," and he became a member of the Gangster Disciples in "[a]bout April or May of 2005." Id. at 105; see also Oct. 27, 2010 a.m. at 22 ("It was around April or May of 2005" that Mr. Charris was initiated into the Gangster Disciples.).

Mr. Charris then testified about Gangster Disciples meetings and Mr. Williams' marital status:

16

> *Q.* Were there meetings held of the Gangster Disciples?
> *A.* Yes, there were.
> *Q.* Where were the meetings held?
> *A.* They were different places, no exact place.
> *Q.* Were they ever held at the defendant's house?
> *A.* There was one meeting there, yes.
> *Q.* And did you go over there?
> *A.* Yes.
> *Q.* Do you know the defendant's wife?
> *A.* I know of her, yes.
> *Q.* Do you know who he lived with?
> *A.* His wife.
>
> *The Court*: Did you ever meet his wife?
> *The Witness*: I did.
>
> *Q.* And was she there when you went to that meeting?
> *A.* She was.

Oct. 26, 2010 p.m. Trial Tr. at 109.

3. *Themitrios Saroglou*. Mr. Saroglou was initiated into the Gangster Disciples in "the summer of 2004," Oct. 29, 2010 a.m. Trial Tr. at 20, and he identified himself as the gang's "treasurer." Id. at 44. Mr. Saroglou, like Mr. Sims, identified Government Exhibit 47 as a photograph of Mr. Williams' home in Germany, and he stated that he had been to Mr. Williams' home "[a]t least three to five times, easy." Id. at 63. He then was asked, without any specific time reference, "whether or not [Mr. Williams] lives there with anyone?" Id. Mr. Saroglou responded: "Yeah, he lived there with his wife, Octavia." Id.

It is clear upon review of the record that neither Mr. Sims, nor Mr. Charris, nor Mr. Saraglou testified that Mr. Williams was living with his wife specifically on July 3, 2005. So the question remains: what could a reasonable juror infer, if anything, from their testimony?

17

Mr. Charris' testimony is the most relevant. He testified that he became a member of the Gangster Disciples in "[a]bout April or May of 2005." Oct. 26, 2010 p.m. Trial Tr. at 105. He then testified about Gangster Disciples "meetings." Id. at 109; see id. at 110. Within his testimony about those meetings, Mr. Charris stated (1) that he knew Mr. Williams' wife; (2) without qualification, that Mr. Williams "lived with" his wife; and (3) that Mr. Williams' wife was present at one Gangster Disciples meeting that Mr. Charris attended at Mr. Williams' home. Id. at 109.

Considering that testimony in the light most favorable to the government, the Court concludes that a reasonable juror could find that Mr. Charris became a member of the Gangster Disciples as late as the end of May 2005. A reasonable juror could infer that Mr. Charris would only know about and attend Gangster Disciples meetings *after* he became a member of that gang. If Mr. Charris became a member of the Gangster Disciples at the end of May 2005, then a reasonable juror could infer that the meetings he mentioned would have taken place sometime in June or early July 2005. And one of those meetings, which Mr. Charris attended, was held at Mr. Williams' home with his wife present. A reasonable juror therefore could infer from Mr. Charris' testimony that it was during the time frame of June to early July 2005 that Mr. Williams "lived with" his wife. Oct. 26, 2010 p.m. Trial Tr. at 109. That inference is further supported by Mr. Sims' and Mr. Saroglou's general testimony that Mr. Williams lived with his wife in his home in Germany, identified as Government Exhibit 47. See Oct. 25, 2010 p.m. Trial Tr. at 4-5; Oct. 29, 2010 a.m. Trial Tr. at 63.

As Mr. Williams points out, Mr. Sims testified that, as of June 2005, Mr. Williams and his wife were having marital problems. Mr. Sims later testified that during the

18

course of Mr. Williams' marital problems, he was "moving around staying with people," and "was all over the place." Oct. 26, 2010 p.m. Trial Tr. at 29. Notwithstanding that testimony, the government argues that "there was absolutely no testimony or any other evidence that the defendant ever 'resided' at a location other than with his wife on July 3, 2005." Opp. at 4 n.2; see also id. at 5 ("[T]he testimony unequivocally provides that Octavia Williams was the only person with whom the defendant 'resided' or with whom he lived during the year 2005[.]"). The government is wrong. Mr. Sims' testimony that Mr. Williams was "moving around staying with people," Oct. 25, 2010 p.m. Trial Tr. at 29, provides such evidence. See United States v. Lovelock, 170 F.3d 339, 344 (2d Cir. 1999) ("The colloquial use of th[e] word ['stays'] is consistent with 'resides[.]'"); see also United States v. Risse, 83 F.3d 212, 216-17 (11th Cir. 1996) (in the Fourth Amendment context, holding that a police officer reasonably believed that an individual resided with the defendant because, among other things, the individual said that she was "staying with" the defendant).

In view of Mr. Sims' testimony, a reasonable juror *could* have inferred that Mr. Williams was residing with someone other than his wife on July 3, 2005. In view of Mr. Charris' testimony, a reasonable juror also *could* have inferred that Mr. Williams was residing with his wife on July 3, 2005. And, as noted, under the case law, one may simultaneously have more than one residence. See United States v. Venturella, 391 F.3d at 125; United States v. Namey, 364 F.3d at 845. But, in either case, the question under Rule 29 of the Federal Rules of Criminal Procedure is whether a reasonable juror "*must necessarily*" have had a reasonable doubt that Mr. Williams resided with his wife on July 3, 2005. United States v. Weisz, 718 F.2d at 437 (emphasis in original). Under that standard, Mr. Williams' motion must fail. A reasonable juror

19

could have chosen not to credit Mr. Sims' testimony, and a reasonable juror could have inferred from Mr. Charris' testimony that Mr. Williams resided with his wife on July 3, 2005.

IV. CONCLUSION

For the foregoing reasons, Mr. Williams' motion for judgment of acquittal on Count One [Dkt. No. 141] will be DENIED. An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

DATE: November 17, 2011

/s/
PAUL L. FRIEDMAN
United States District Judge